UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| _____ | : | |
| SYED ARSHADULLAH and RON | : | Case No. |
| PIERCE, individually, on behalf of all others | : | |
| similarly situated and on behalf of the BP | : | |
| Employee Savings Plan, BP Capital | : | CLASS ACTION COMPLAINT |
| Accumulation Plan, BP Partnership Savings | : | FOR VIOLATIONS OF THE |
| Plan and the BP DirectSave Plan, | : | EMPLOYEE RETIREMENT |
| | : | INCOME SECURITY ACT OF 1974 |
| Plaintiffs, | : | ("ERISA") |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| BP P.L.C., BP Corporation North America | : | |
| Inc., the Investment Committee, the Savings | : | |
| Plan Investment Oversight Committee, | : | |
| Richard J. Dorazil, Lamar McKay, Gregory | : | |
| T. Williamson, Stephanie Atkins, Neil Shaw, | : | |
| Thomas L. Taylor, Byron Grote and State | : | |
| Street Bank and Trust Company, | : | |
| Defendants. | | |
| _____ | | |

## **COMPLAINT**

Plaintiffs Syed Arshadullah and Ron Pierce ("Plaintiffs"), individually, as a representatives of the BP Employee Savings Plan ("ESP'), the BP Capital Accumulation Plan ("CAP"), the BP Partnership Savings Plan ("PSP") and the BP DirectSave Plan ("DSP") (collectively, the "Plan" or "Plans"), and, to the extent deemed necessary by the Court, on behalf of a class of similarly situated participants in the Plan (the "Participants"), by their attorneys, allege the following for their Complaint ("Complaint"):

## **NATURE OF ACTION**

1.     Plaintiff Syed Arshadullah is a Participant in the PSP.  Plaintiff Ron

Pierce is a Participant in the ESP.  Plans cover eligible United States employees of BP
p.l.c. and/or BP Corporation North America Inc. and their affiliated companies
(collectively, "BP" or the "Company").  Plaintiffs bring this action pursuant to §
502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29
U.S.C. § 1132(a)(2) and (3), as representatives of the four BP 401(k) plans and, to the
extent deemed necessary by the Court, on behalf of a class of all Participants in those
plans for whose individual accounts the Plan invested in the BP Company Stock Fund
(the "Fund") from April 20, 2010 to the present (the "Class Period").

        2.      As more fully set forth below, BP p.l.c., BP Corporation North America
Inc., the Investment Committee, the Savings Plan Investment Oversight Committee,
Richard J. Dorazil, Lamar McKay, Gregory T. Williamson, Stephanie Atkins, Neil Shaw,
Thomas L. Taylor, Byron Grote and State Street Bank and Trust Company (collectively,
"Defendants") breached their fiduciary duties owed to the Plan and the Participants,
including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and
Department of Labor Regulations 29 C.F.R. § 2550.  As a result of these breaches,
Defendants are liable to the Plan for all losses resulting from each such breach of
fiduciary duty.  Plaintiffs also seek equitable relief.

        3.      Plaintiffs' claims arise out of the imprudent investment of Plan assets in
the Fund after BP's financial condition drastically deteriorated as a result of its Gulf of
Mexico oil spill on April 20, 2010 (the first day of the class period).

        4.      As alleged below, the Plan's investment in the Fund and the Fund's
investment in BP stock[1] were imprudent because BP was an excessively risky

---

[1] BP "stock" means the equity securities held by the Fund issued by BP including BP American Depository

investment. As market participants immediately and repeatedly made clear, BP's massive unquantifiable liabilities arising from the ingoing oil spill created a high risk of bankruptcy for BP that rendered the Fund and BP stock imprudent investments for retirement plan assets.

5.      As a consequence of these excessive risks, it was imprudent for Defendants to (1) offer the Fund as a Plan investment option, (2) invest Plan assets in the Fund, and (3) invest Fund assets in Company stock during the Class Period.

## JURISDICTION AND VENUE

6.      Plaintiffs' claims arise under and pursuant to ERISA § 502, 29 U.S.C. § 1132.

7.      This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is a District where the Plan was administered, where breaches of fiduciary duty took place and/or where one or more Defendants reside or may be found.

9.      In particular, according to documents filed by or on behalf of the Plan with the United States Securities and Exchange Commission, including a Form 11-K filed June 16, 2010, the address for all four Plans is 4101 Winfield Road, Warrenville, Illinois 60555.

## THE PARTIES

10.     **Plaintiff Syed Arshadullah** is a resident of the state of Illinois who was a

---

Shares (ADSs), BP American Depository Receipts (ADRs) and/or other BP equity securities.

Participant in the BP Partnership Savings Plan at all times relevant to the Complaint and maintained an investment in the Fund in his individual account in that plan during the Class Period.

11.     **Plaintiff Ron Pierce** is a resident of the state of California who was a Participant in the BP Employee Savings Plan at all times relevant to the Complaint and maintained an investment in the Fund in his individual account in that plan during the Class Period.

12.     **BP p.l.c.** is a public limited company incorporated in England and Wales. BP p.l.c.'s principal executive offices are located at 1 St. James's Square, London SW1Y 4PD, England.

13.     **BP Corporation North America Inc.** is an Indiana corporation with its principal executive offices at MC 2 East, 4101 Winfield Road, Warrenville, IL 60555. BP Corporation North America Inc. is the company formerly named BP Amoco Corporation and, before that, named Amoco Corporation, which was acquired by BP p.l.c. or its predecessor in or about 1998.  On information and belief, BP Corporation North America Inc. is a wholly owned subsidiary or other fully controlled entity of BP p.l.c.  BP Corporation North America Inc. is the Sponsor of the Plan.

14.     **The Investment Committee** is the entity named in Plan Documents with fiduciary responsibility over the selection and removal of Plan investment options.  The Investment Committee is the Named Investment Fiduciary. ESP Sec. 1.56; DSP Sec. 1.54.

15.     **The Savings Plan Investment Oversight Committee** ("SPIOC") is an

entity with fiduciary responsibility over Plan investment options.[2] The Investment

Committee and the SPIOC are hereinafter referred to as the Investment Committee.

16.     **Richard J. Dorazil** ("Dorazin") is a natural person who is the Vice

President Total Rewards, Western Hemisphere for BP p.l.c. and/or BP Corporation North

America Inc.  By virtue of his position with the Company, he is the Named Plan

Administrator.  On information and belief, Dorazil is also a member of the SPIOC and/or

the Investment Committee.

17.     **Lamar McKay** ("McKay") is the Chief Representative of BP in the

United States.  On information and belief, McKay is a member of the Investment

Committee.

18.     **Gregory T. Williamson** ("Williamson") is the Director of Trust

Investments for BP in the United States.  On information and belief, Williamson is the

Secretary of the the Investment Committee.

19.     **Stephanie Atkins** ("Atkins") is the BP Vice President Human Resources

WY Operations and SAP Development.  On information and belief, Atkins is a member

of the Investment Committee.

20.     **Neil Shaw** ("Shaw") is a BP Strategic Performance Unit Leader, in charge

of BP's Gulf of Mexico division.  On information and belief, Shaw is a member of the

Investment Committee.

21.     **Thomas L. Taylor** ("Taylor") is, on information and belief, a member of

the Investment Committee.

---

[2] The SPIOC is not identified by name in the Plan Documents.  However, SPIOC has brought suit on behalf
of the Plans against one of the Plans' Investment Managers, *PB Corp. North America Savings Plan
Investment Oversight Committee v. Northern Trust*, No. 08-6629 (N.D. Ill).  Therefore, upon information

22.     **Byron Grote ("Grote")** is the Chief Financial Officer of BP and, according to Plan Documents, a Named Investment Fiduciary in the event an Investment Committee is not appointed.

23.     **The State Street Bank and Trust Company** ("State Street") is a Massachusetts trust company with offices at One International Place, Boston, MA 02110. State Street is the Trustee of the Plan.  According to Update #3 to the Investment Options Guide dated August 2009 ("Update #3"), a unit of State Street, State Street Global Advisors ("SSgA"), was the Investment Manager for several of the mutual funds offered by the Plan.  However, according to Update #3, State Street Bank and Trust  Company itself, not SSgA, was the Investment Manager of the Company Stock Fund.

## CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action individually and on behalf of the Plan and, to the extent deemed necessary by the Court, as a class action pursuant to Rules 23(a), (b)(1) and/or (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, if and to the extent a class is deemed necessary, on behalf of a class consisting of all current and former Participants in the Plan for whose individual accounts the Plan held shares of BP common stock (directly and/or through shares in the Fund) from April 20, 2010 to the present (the "Class").

25.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum, tens of thousands of members of the Class.  The Form 5500

and belief, the SPIOC had the fiduciary responsibilities allocated to an "Investment Committee" by the Plan

Annual Return for the BP Employee Savings Plan filed with the Internal Revenue Service

("IRS") on or about October 3, 2008 states that there were 42,222 Participants in that

plan as of January 1, 2007.

26.      Common questions of law and fact exist as to all members of the Class

which predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

> (a)      Whether Defendants were fiduciaries;
>
> (b)      Whether Defendants breached their fiduciary duties;
>
> (c)      Whether the Plan and the Participants were injured by such
> breaches; and
>
> (d)      Whether the Class is entitled to damages and injunctive relief.

27.      Plaintiffs' claims are typical of the claims of the other members of the

Class, as Plaintiffs and all members of the Class sustained injury arising out of

Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as

complained of herein.

28.      Plaintiffs will fairly and adequately represent and protect the interests of

the Class.  Plaintiffs have retained able counsel with extensive experience in class action

and ERISA litigation.  The interests of Plaintiffs are coincident with and not antagonistic

to the interests of the other class members.

29.      Prosecution of separate actions by members of the Class would create a

risk of inconsistent adjudications with respect to individual members of the Class which

would establish incompatible standards of conduct for Defendants, or adjudications with

---

Documents.  See, e.g., ESP Plan Document Sec. 6.3; DPS Plan Document Sec. 6.3.

respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

30.     Questions of law and questions of fact which are common to the members of the Class will predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this Complaint, taking into account:

(a)     the interest of members of the Class in individually controlling the prosecution or defense of separate actions;

(b)     the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

(c)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(d)     the difficulties likely to be encountered in the management of a class action.

31.     Moreover, because the damages suffered by many of the Class members will be relatively small, the expense and burden of individually litigating their rights would make it impossible to redress the wrongs alleged herein individually.

## DESCRIPTION OF THE PLAN

32.     On information and belief, the relevant provisions of all four of the BP Plans are the same except for the groups of employees covered by each plan and the contribution and matching provisions of each plan, as set forth below.  The basis for this belief is the fact that BP filed a single Form 11-K Annual Report with the Securities and

Exchange Commission on June 16, 2010 (hereinafter, "Form 11-K") for all of the Plans collectively, describing the Plans' administrative provisions in common except for differences in matching and contribution limits.

33.     At all times relevant to this Complaint, the Plan was an "Employee Benefit Plan" within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A), and an "Employee Pension Benefit Plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. §§ 1002(2)(A).

34.     The Plan was an "Eligible Individual Account Plan" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1107(d)(3), and a "Qualified Cash or Deferred Arrangement Plan" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

35.     The Plan was a "Defined Contribution" and "Individual Account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

36.     The purpose of the Plan, as set forth on Form 11-K filed by BP with the Securities and Exchange Commission on June 16, 2010 (hereinafter, "Form 11-K"), is:

> The purpose of the Plans is to encourage eligible employees to regularly save part of their earnings and to assist them in accumulating additional financial security for their retirement.

37.     According to the Form 11-K, Plan participants could make contributions to each of the Plans as follows.  For the ESP:

> Under ESP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth

> 401(k) basis, subject to Internal Revenue Service ("IRS") limits.  Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to IRS limits. A specified portion of the employee contribution, up to a maximum of 7% of compensation, as defined, is matched by the Company.  Participants are permitted to rollover amounts into ESP representing distributions from other qualified plans.

See also , ESP Sec. 3.1.

For the CAP, the Form 11-K states:

> Under CAP, participants may contribute up to 27% of their base pay, subject to IRS limits. Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to IRS limits. The Company makes matching contributions to the participant's account at 160% of the participant's pre-tax contribution, up to a maximum Company contribution of 8% of the participant's base salary. Participants are permitted to rollover amounts into CAP representing distributions from other qualified plans.

For the PSP, the Form 11-K states:

> Under PSP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to IRS limits.  Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to IRS limits.  A specified portion of the employee contribution, up to a maximum of 3% of compensation, as defined, is matched by the Company.  Participants are permitted to rollover amounts into PSP representing distributions from other qualified plans.

For the DSP the Form 11-K states:

> Under DSP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to IRS limits. Participants who attain age 50 before the end of the applicable year are eligible to make additional elective deferrals (catch-up contributions), subject to IRS limits.  Except for eligible employees of Air BP, the Company makes matching contributions to the participant's account equal to $0.50 for each $1.00 of employee contributions up to 4% of compensation. Participants are permitted to rollover amounts into DSP representing distributions from other qualified plans.

See also, DSP Sec. 3.1.

38.     For the ESP, the Company made matching contributions in the amount of 100% of each participant's pre- and after-tax contributions not in excess of 7% of eligible compensation. ESP Sec. 3.3.

39.     Contributions were invested in Investment Options. ESP Sec. 1.58; DSP Sec. 1.54. One available Investment Option was the Company Stock Fund which invested in American Depository Shares of BP p.l.c. ESP Sec. 1.26-27; DSP Sec. 1.24-25.

40.     According to the Form 11-K, Plan contributions were invested as follows:

> Participants may elect to invest in numerous investment options offered under their respective plan. Participants may change the percentage they contribute and the investment direction of their contributions at any time. Company contributions are made in the form of cash contributions and are invested in funds selected by participants. Participants may elect to sell any portion of their investment fund(s) and reinvest the proceeds in one or more of the other available investment alternatives. Except where the fund provider, the recordkeeper, or the plan has restrictions or takes discretionary action responsive to frequent trading or market timing concerns, there are no restrictions on the number of transactions a participant may authorize during the year.

> Effective September 1, 2009, the investment options offered under the Plans were revised. The revised investment options comprise target date funds, index funds, a short-term investment fund, a stable value fund and the BP stock fund. Several investment options offered will be eliminated. Unless directed otherwise, new participant contributions invested in a discontinued investment option after December 31, 2009 were redirected into an age appropriate target date fund. Participants will have until close of business on August 31, 2010 to transfer balances out of discontinued funds. Balances remaining in a discontinued fund at close of business on August 31, 2010 will be transferred into an age appropriate target date fund.

See, also, ESP Sec. 6.1; DSP Sec. 6.1.

41.     Only company matching contributions to the ESP were required to be invested in the Company Stock Fund. ESP Sec. 3.3.

42.     The Plan Investment Options were selected, monitored and removed by the Investment Committee as follows:

Investment Options. The Plan's Investment Options are indicated in Appendix 1.54.  In addition, a Designated Officer may, from time to time, as directed by the Investment Committee:

     (a)     limit or freeze investments in, or transfers from, an Investment Option;

     (b)     add funding vehicles thereunder;

     (c)     liquidate, consolidate or otherwise reorganize an existing Investment Option; or

     (d)     add new Investment Options to, or delete Investment Options from, Appendix 1.54.

ESP Sec. 6.3; DSP Sec. 6.3.

43.     "Designated Officer" means the Senior Vice President and any other officer of the Company, the Group Vice President, Human Resources of BP p.l.c. and any other officer of BP p.l.c., to whom (but only to the extent specifically provided) authority to act on behalf of the Company has been granted by the Board of Directors or one of its committees.  ESP Sec. 1.34; DSP Sec. 1.32.

44.     In addition, according to the Plan's Investment Options Guide dated August 2008 and Update #3 to the Investment Options Guide dated August 2009, "The investment manager [State Street] determines the appropriate level of liquidity for the BP Stock Fund while attempting to meet the Fund's investment objective.  Under limited circumstances and in accordance with ERISA, the investment manager may attempt to liquidate all the BP ADSs in the BP Stock Fund should the investment manager or BP determine such an investment is no longer prudent."

45.     As of December 31, 2009, the Plan held BP stock valued at approximately $2,453,191,000.

## DEFENDANTS WERE FIDUCIARIES

46.     At all times relevant to this Complaint, Defendants were fiduciaries of the

Plan because:

      (a)     they were so named; and/or

      (b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

      (c)     they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

      (d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

47.     In that regard, a person is a fiduciary even if a plan does not name him or her as such or by its terms assign fiduciary duties to him where by his conduct he engages in fiduciary activities. The test for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

48.     A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

**Defendants BP p.l.c. and BP Corporation North America Inc.[3]**

---

[3] These allegations are made against both BP corporate Defendants because the actual internal corporate

49.     BP was a fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that it managed, administered and operated the Plan, exercised authority or control over the management and disposition of the Plan's assets and disseminated communications about the Plan to Participants.  In particular:

a.     According to the Plan's Investment Options Guide dated August 2008 and Update #3 to the Investment Options Guide dated August 2009, BP had the overriding duty to determine whether BP stock and the Fund were prudent investments and to notify State Street, the Investment Manager of the Fund, when "BP determine[s] such an investment is no longer prudent" so that State Street could close down the Fund. This duty to determine whether or not Company stock is or is not a prudent investment for the Plan touches the heart of Plaintiff's claims and demonstrates that BP was a fiduciary under ERISA § 3(21), 29 U.S.C. § 1002(21).

b.     BP also had responsibility for "designating" the Investment Committee.  See, e.g., ESP Plan Document, Sec. 1.56.  BP therefore had the duty to appoint persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties, including the duty to evaluate the merits of investment options under the Plan.  BP also had an ongoing duty to ensure that the persons it appointed were fully informed and performing their duties properly with respect to the selection of investment options under the Plans and the investment of the assets of the Plans.

c.     The Investment Committee was, on information and belief, composed entirely of BP employees serving in that role as part of their employment at

---

division of relevant responsibilities between the various BP entities is not presently known and may only be

BP.

        d.      On information and belief, the Investment Committee delegated its responsibility for administering the Plan to other employees of BP.  Pursuant to this delegation, BP, in fact, administered the Plans and exercises authority and control over Plan assets.

        e.      Upon information and belief, BP, through its treasury, human resources, and legal departments, directed the Plan's Trustee concerning the investment of the Plan's assets in the Fund and the Fund's assets in BP stock.

        f.      Upon information and belief, the actual members of the Investment Committee spent very little time on matters relating to administration of the Plan and the Plan's investments.  Rather, upon information and belief, these jobs were performed by other BP employees acting in the scope of their day to day duties and, in particular, by BP's human resources, legal, corporate communications, finance and treasury personnel.  In particular, on information and belief, BP employees monitored the Plan's investments, and communicated with Participants concerning Plan's investments and investment risk and return characteristics, including the Fund.

        g.      Upon information and belief, the Investment Committee members served on the Committee as part of and in the ordinary course of their BP employment without any additional compensation.  Accordingly, BP is responsible and liable for their actions.

**Defendant Richard J. Dorazil**

       50.     The Named Plan Administrator is the Vice President Total Rewards,

---

determined after appropriate discovery.

Western Hemisphere.  See, e.g., ESP Plan Document §§ 1.7 and 1.71.  The Summary

Plan Description ("SPD") for the ESP confirms this fact.  According to the Form 11-K,

Richard J. Dorazil ("Dorazil") holds this position at BP.

51.     Dorazil, as the Named Plan Administrator, is the fiduciary of the Plan for

all purposes pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

**Defendants Investment Committee and Grote**

52.     As set forth above, according to Sec. 6.3 of the ESP and DSP, the

Investment Committee (or, if there is no Investment Committee, CFO Grote) selects,

monitors and removes all Plan Investment Options.  Upon information and belief, these

same provisions were continued in the other three Plans that are the subject of this action

53.     The Investment Committee and Grote were therefore fiduciaries pursuant

to § 3(21), 29 U.S.C. § 1002(21), in that they exercised authority or control over the

management and disposition of the Plan's assets.

**Defendant State Street Bank and Trust Company**

54.     According to the Plan's Investment Options Guide dated August 2008 and

Update #3 to the Investment Options Guide dated August 2009, State Street was the

Investment Manager of the Fund who, specifically, had an obligation to liquidate BP

stock held by the Fund in the event that such investment was imprudent.

55.     State Street was the Plan Trustee.

56.     As both the Plan Trustee generally and the Investment Manager of the

Fund particularly, State Street was a fiduciary within the definition of § 3(21), 29 U.S.C.

§ 1002(21), in that it exercised authority or control with respect to the management or

disposition of the Plan's assets.

## FIDUCIARY DUTIES UNDER ERISA

57.     **The Statutory Requirements.**  ERISA imposes strict fiduciary duties

upon plan fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the
> interest of the participants and beneficiaries and . . . for the exclusive purpose
> of providing benefit to participants and their beneficiaries; and defraying
> reasonable expenses of administering the plan; with the care, skill, prudence,
> and diligence under the circumstances then prevailing that a prudent man
> acting in a like capacity and familiar with such matters would use in the
> conduct of an enterprise of like character and with like aims; by diversifying
> the investments of the plan so as to minimize the risk of large losses, unless
> under the circumstances it is clearly prudent not to do so; and in accordance
> with the documents and instruments governing the plan insofar as such
> documents and instruments are consistent with the provisions of this title and
> Title IV.

58.     **The Duty of Loyalty.**  ERISA imposes on a plan fiduciary the duty of

loyalty--that is, the duty to "discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries and . . . for the exclusive purpose of . . .

providing benefits to participants and their beneficiaries . . . ."

59.     The duty of loyalty entails a duty to avoid conflicts of interest and to

resolve them promptly when they occur.   A fiduciary must always administer a plan with

an "eye single" to the interests of the participants and beneficiaries, regardless of the

interests of the fiduciaries themselves or the plan sponsor.

60.     **The Duty of Prudence.**  Section 404(a)(1)(B) also imposes on a plan

fiduciary the duty of prudence--that is, the duty "to discharge his duties with respect to a

plan solely in the interest of the participants and beneficiaries and . . . with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man,

acting in a like capacity and familiar with such matters would use in the conduct of an

enterprise of a like character and with like aims. . . ."

17

61.     **The Duty to Inform.**  The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: 1) a negative duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.  These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

62.     Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants.  Defendants were required to furnish the Summary Plan Description and a Prospectus to Participants.  The SPD, the Prospectus and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).  Here, the Plan's Investment Option Guide, "Investing in

You," purported to make that required disclosure concerning the Fund by incorporating

by reference into the Plan Prospectus certain BP p.l.c. SEC filings as follows:

> The following documents filed by BP p.l.c. with the Securities and Exchange Commission (SEC) are incorporated into the plan prospectus by reference:
> • BP Annual Report on Form 20-F for the year ended December 31, 2007.
> • BP Reports on Form 6-K (SEC file number 001-6262) dated April 24, 2008 and August 1, 2008.
> • BP Report on Form 6-K (SEC file number 001-6262) dated August 6, 2001, which contains a description of the ordinary shares of BP p.l.c.
> • In addition, we incorporate by reference any future filings made with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the date of this offering memorandum that indicate on the cover pages that they are incorporated by reference and until this offering is completed.

63.     **The Duty to Investigate and Monitor Investment Alternatives.**  With

respect to a pension plan such as the Plan, the duties of loyalty and prudence also entail a

duty to conduct an independent investigation into, and continually to monitor, the merits

of the investment alternatives in the Plan including employer securities, to ensure that

each investment is a suitable option for the Plan.

64.     **The Duty to Monitor Appointed Fiduciaries**.  Fiduciaries who have the

responsibility for appointing other fiduciaries have the further duty to monitor the

fiduciaries thus appointed.  The duty to monitor entails both giving information to and

reviewing the actions of the appointed fiduciaries.  In a 401(k) plan such as the Plan the

monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a)     possess the needed credentials and experience, or use qualified

advisors and service providers to fulfill their duties;

(b)     are knowledgeable about the operations of the Plan the goals of the

Plan and the behavior of Plan's participants;

(c)     are provided with adequate financial resources to do their jobs;

(d)      have adequate information to do their jobs of overseeing the Plan's

investments with respect to company stock;

(e)      have access to outside, impartial advisors when needed;

(f)      maintain adequate records of the information on which they base

their decisions and analysis with respect to Plan's investment options; and

(g)      report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the

hands-on fiduciaries.

65.   **The Duty Sometimes to Disregard Plan Documents**.  A fiduciary may

not avoid his fiduciary responsibilities by relying solely on the language of the plan

documents.  While the basic structure of a plan may be specified, within limits, by the

plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to

an imprudent result or if such is the result of a lack of loyalty.  ERISA § 404(a)(1)(D), 29

U.S.C. § 1104(a)(1)(D).

66.   **Co-Fiduciary Liability**.  A fiduciary is liable not only for fiduciary

breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain

circumstances.  ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision
> of this part, a fiduciary with respect to a plan shall be liable for a breach of
> fiduciary responsibility of another fiduciary with respect to the same plan
> in the following circumstances:
>
> (1)      if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing such act or
> omission is a breach; or
>
> (2)      if, by his failure to comply with section 404(a)(1) in the
> administration of his specific responsibilities which give rise to his status
> as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)      if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

67.      **Non-Fiduciary Liability**.  Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## SUBSTANTIVE ALLEGATIONS

### *BP's ongoing, unquantifiable Deepwater Horizon oil spill is already the largest - and costliest - in U.S. history*

68.      The night of April 20, 2010, an explosion rocked the Deepwater Horizon offshore oil rig in the Gulf of Mexico that was leased by and operated under the direction of BP Plc.  Roughly 36 hours later, the rig sank and a five mile long oil slick was already visible, prompting BP Vice President David Rainey to warn on April 23, 2010 of the potential for a "major oil spill."  By that time, three attempts had already failed to halt the "uncontrolled" release of crude oil and natural gas from the well, which had been drilled into the Macondo Prospect to tap crude reserves that BP had estimated pre-spill to be 50 million to 100 million barrels.

69.      At the outset, this incident was recognized as having the potential to eclipse the Exxon Valdez and become the nation's worst oil spill.  In just two months, it has already done so and is among the worst oil spills in world history.  From Day One, this uncontrolled underwater geyser of oil has posed a grave risk to BP's stock price, credit ratings, and ability to continue to operate as a standalone business concern, rending an investment in BP stock imprudent.  Indeed, by June 25, 2010, BP's stock had plummeted 53% since the Deepwater Horizon rig exploded, wiping an astounding $104.7 billion off BP's market value in just over 60 days.  The gravity of the risk and uncertainty

BP has faced since the start of this disaster is apparent in four key respects.

70.     First, from the outset, BP has been unable or unwilling to accurately quantify the amount of oil spewing from the damaged well, and without accurate data, it is impossible to quantify the total amount of oil spilled to date or the rate at which the total spill is increasing.  Defendant McKay, in testimony before Congress on May 19, 2010, admitted, that "There are a range of estimates and it's impossible to measure." BP's "official" reported estimates of the spill rate have increased from 1,000 barrels (42,000 gallons) of oil a day on April 24, 2010 to 5,000 barrels (210,000 gallons) a day on from April 28 - May 27, 2010 to 25,000 - 40,000 barrels (1.05 million gallons to 1.68 million gallons) a day on June 10, 2010 to 35,000 - 60,000 barrels (1.5 million gallons to 2.5 million gallons) a day from June 15, 2010 onward – with no definitive end point in sight.

71.     However, "unofficial" flow rate estimates by BP and others have consistently been substantially higher, meaning even greater risk to BP.  For instance, on May 2, 2010, U.S. Coast Guard Commandant Adm. Thad Allen said the leak "could be 100,000 barrels (4.2 million gallons) or more a day" and that the "indeterminate" spill was "asymmetrical, anomalous, and one of the most complex things we've ever dealt with."  On May 5, 2010, BP told Congress in a closed-door session that the worst-case scenario was 10,000 – 60,000 barrels a day.  An internal BP document from May 2010, released by Congress on June 20, 2010, said the flow rate could rise from 60,000 to 100,000 barrels under certain circumstances.  On May 13, 2010, based on BP's released video footage of the leak, Purdue University associate professor Steve Wereley used "well-established" methods to peg the flow rate at 70,000 barrels a day.  On May 26,

2010, Bloomberg News reported that some scientists were estimating the flow rate at 100,000 barrels a day.  On June 1, 2010, Matthew Simmons, a prominent oil expert, founder of boutique investment house Simmons & Co., and energy advisor to former President George W. Bush, estimated the flow rate as high as 120,000 barrels a day.

72.     Moreover, no accurate data exists regarding how much crude lies in the reservoir tapped by the blown well, because BP had not completed testing of the underlying oil field before the Deepwater Horizon rig exploded.  However, a June 18, 2010 CBS News report ominously stated, "The Macondo oil well could be one of the largest oil discoveries in the world," citing a *Times of London* report that, based on the flow rate analysis of Energy Security Analysis oil industry expert Rick Mueller, the blown well could contain as much as 1 billion barrels of oil and could keep flowing for more than a decade.  CBS News also reported on June 17, 2010, that Dr. Leo Drollas, chief economist and deputy director of the Center for Global Energy Studies, said that the field could hold 10 billion barrels.  Without knowing this figure, there is no way to know when the well might exhaust itself in the event that BP cannot find a way to curtail its flow of oil.

73.     Second, from the outset, BP's limited options in trying to stop the oil flowing from its blown well 18,000 feet (including 5,000 feet of water) below the Gulf's surface were complex, high-risk feats of engineering, many of them "unprecedented" at such depths.  BP has been unable or unwilling to accurately convey the slim probability of success of each of these measures and each failed.  The steps taken included multiple attempts to engage the crippled blowout preventer beginning on April 25, 2010; deployment of a 98-ton containment dome on May 5-7, 2010; deployment of a smaller

"top hat" containment system on May 12, 2010; a "top kill" using over 30,000 barrels of heavy drilling mud (which BP had estimated as having a 60%-70% chance of success) on May 26-29, 2010; and a "junk shot" using assorted debris on May 28-29, 2010.

74.     By June 1, 2010, BP's near-term strategy had shifted completely away from halting the flow of oil to simply capturing as much of it as possible.  However, BP's daily oil capture rate, via collection and flaring, following implementation of a lower marine riser package cap on June 3, 2010 and subsequent modifications, had risen to only 24,450 barrels (1.03 million gallons) as of June 27, 2010, representing less than 41% of the "official" estimate of 60,000 barrels and under 25% of the "unofficial" high-end estimates of 100,000 barrels leaking into the Gulf each day.  In total, as of June 28, 2010, BP has only managed to prevent just 1.325 million barrels of oil from spilling into the Gulf via recovery/flaring (435,600 barrels), surface skimming (652,000 barrels), and controlled burns (238,000 barrels) – as compared to the 4.2 million barrels (based on a 60,000 barrels per day estimated flow rate) to 7.0 million barrels of oil (based on a 100,000 barrels per day flow rate) that had already leaked out of BP's blown in the 70 days since April 20, 2010.

75.     Since the outset of the Deepwater Horizon disaster, BP's best chance – and at this point its only chance – at stopping the spill altogether was its ongoing drilling of two relief wells, which began on May 2 and May 16, 2010, respectively, and which will take at least until early August 2010 to complete.  But, there is no guarantee that the Frisbee-sized relief wells will work, given that the strategy is, as reported by the Associated Press on June 21, 2010, the equivalent of "hit[ting] a target roughly the size of a salad plate about three miles below the water's surface."  Indeed, the incoming

president of the American Association of Petroleum Geologists, David Rensink, told Bloomberg that the chances of the relief wells working on the first attempt are equivalent to the odds of winning the lottery and that initial failure was "almost a certainty."

76.   Third, since the beginning of the Deepwater Horizon disaster, BP's massive financial exposure could not be conclusively determined because the immeasurable spill is continuing unabated, weeks after reaching landfall, with no end in sight.  Some major components of BP's nearly-unquantifiable total exposure, which as of June 28, 2010 has already caused BP to pay out $2.65 billion and which is generating further expense at the rate of $100 million per day:

a.   BP, which is self-insured, has admitted responsibility for all containment and cleanup costs related to the ongoing oil spill, both at sea and on land. Those costs, which alone had already totaled $1.6 billion as of June 18, 2010, when they were already rising at the rate of over $33 million per day as BP pays for, *inter alia*, an armada of over 5,000 collection and containment vessels, two rigs drilling relief wells, over 110 aircraft spraying chemical dispersants, and nearly 40,000 personnel.  While Louisiana Treasurer John Kennedy has said that BP's costs could ultimately range from $40 billion to $100 billion, no one knows how much BP will ultimately spend.  All estimates would dramatically worsen if storms during the Atlantic hurricane season cause BP to periodically suspend its containment efforts (thus permitting oil to once again flow unfettered into the Gulf for the duration of each storm) and cause spilled oil to spread over a greater area and wash ashore in larger amounts.

b.   BP has accepted responsibility to pay all "legitimate" claims by damaged individuals and businesses, including among others resorts, hotels, restaurants,

beach home owners, charter and commercial fishermen, and seafood processing plants. As of June 18, 2010, $600 million of such claims had been filed, and with its exposure increasing daily, BP has as of June 28, 2010, already paid $128 million to 41,000 claimants out of the 80,000 who had filed claims.  On June 16, 2010, BP agreed to set aside $20 billion in an escrow fund over the next three and one-half years to be independently overseen – without BP oversight – to satisfy such claims going forward. In doing so, BP agreed that the $20 billion figure was not a cap on its exposure and does not supercede the rights of individuals or states to sue it.  BP has also said that it will not ask its minority partners on the Macondo Prospect to contribute to the fund.

c.    BP faces a growing avalanche of civil litigation, which already included over 230 lawsuits pending in federal and state courts in at least 11 states as of June 18, 2010.  These suits include individual personal injury and wrongful death actions on behalf of rig workers stemming from the blast, class actions on behalf of individuals and businesses financially harmed by the spill, class actions alleging violation of securities and racketeering laws, derivative actions, environmental litigation, and a class action on behalf of workers exposed to the 1.3 million gallons of toxic dispersants BP has dispersed.  Some of these lawsuits seek punitive or treble damages.

d.    BP also faces potentially huge civil and criminal exposure from governmental entities.  As reported on June 18, 2010 in a *Wall Street Journal* article entitled "BP Case Will Be One of Largest Ever for DOJ," a team of 40 criminal prosecutors in the Department of Justice ("DOJ")'s Environmental and Natural Resources Division is investigating the Deepwater Horizon disaster.  On June 8, 2010, U.S. Senator Sheldon Williams, a former U.S. Attorney who successfully prosecuted a

spill under the Rivers and Harbors Act of 1989, said on CNBC that the Deepwater

Horizon incident "is almost a lay-down hand as a criminal case at this point and the issue

really is going to be about penalties and damages."  *The Wall Street Journal* reported that

BP's criminal penalties could be up to twice the price tag of the cleanup and damages

costs, and analyst Pavel Molchanov told *the New York Times* on July 17, 2010 that the

cost of the expected criminal suits will likely bring BP's total costs up to nearly $63

billion.  In addition, BP faces an ongoing civil investigation by DOJ's Environment and

Natural Resources Division, as well as coordinated investigations by the Louisiana,

Mississippi, and Alabama attorney generals.  David M. Uhlmann, former head of the

DOJ's environmental crimes division, told *the New York Times* on June 17, 2010 that the

civil penalty alone could amount to $289 million per day.  *The Wall Street Journal*

reported on June 28, 2010 that lawyers advising the Gulf Coast states had said they

would eventually seek multi-billion dollar payouts and that eleven Atlantic Coast states

have sent letters to BP asking it to preserve documents and appoint a liason for their state

attorneys general.  Also, the Xinhua News Agency reported on June 22, 2010 that

Mexican Environment Minister Juan Rafael Elvira Quesada said that Mexico is preparing

a suit against BP for any environmental damage the spill may cause on Mexican territory.


      e.      BP, the biggest oil and gas producer in the U.S., also risks

debarment if the U.S. E.P.A., in light of not only the Deepwater Horizon explosion and

spill but also prior BP violations, takes action against BP.  Penalties could include

cancellation of existing contracts with the U.S. military, prohibition from leasing or

renewing drilling leases on U.S. federal lands, and a worst-case cancellation of BP's

existing federal leases worth billions of dollars.  Such penalties would have a devastating

effect on BP, which as reported by the Associated Press, is "heavily dependent" on the

U.S., in which 40% of its assets (producing $16 billion of its revenues) are located, and is

the largest energy provider to the U.S. military.  On June 15, 2010, DPA reported:

> [U.S.] [l]awmakers had already tasked the Pentagon with reviewing
> whether BP is a "responsible" contractor, a move that puts more than 2
> billion dollars at stake.  BP could also be forced to sell existing drilling
> rigs in the Gulf, including the Thunder Horse, the second-biggest well in
> the United States.

On June 18, 2010, the Associated Press quoted Lawrence Goldstein, a director of the

Energy Policy Research Foundation, as saying, "If the government has a single-minded

focus to be punitive, it could take this company down."

       f.     Under the Clean Water Act, BP is responsible to pay to the U.S.

government up to $4,300 in the case of gross negligence ($1,100 absent gross

negligence) for <u>every</u> barrel of oil leaked – a potentially massive and still-growing

liability.  For example, assuming 90 days of oil spilling at the rate of 60,000 barrels a day

(the operative flow rate estimate at the end of June 2010), the total spilled would already

equate to 5.4 million barrels, which at $4,300 per barrel would equate to a sizable penalty

of $23.22 billion by late July 2010.  If the estimate was 100,000 barrels daily for 90 days

instead, the total spilled in just three months would equal 9.0 million barrels and the

penalty would be a staggering $38.7 billion.  On June 22, 2010, the Environment News

Service reported that the Center for Biological Diversity had filed "the largest citizen

enforcement action ever taken under the Clean Water Act" that seeks to enforce the

"maximum penalty" against BP and that seeks a full accounting from BP of how much

oil is flowing into the Gulf from its blown well and what pollutants are mixed in with the

oil.

g.     Under its drilling lease with the Minerals Management Service for

the Deepwater Horizon well, BP is responsible to pay to the United States government a

royalty fee of 18.75% of the value of any oil or natural gas that is "lost or wasted" if a

leak is due to the company's negligence.  Assuming that 5.4 million barrels of oil will

have spilled by late July 2010 (see preceding paragraph), if that oil was valued at $79 per

barrel (the projected average price per barrel in 2010 by the U.S. Energy Information

Administration), then this BP debt, which is rising daily, will have reached nearly $80

million for the lost oil alone.  That figure does not encompass any royalty fees incurred

for the natural gas spewing out of its blown well, which it flared at the daily rate of 56.2

million cubic feet on June 27, 2010.

h.     BP is also responsible to compensate the federal government for its

costs in addressing the spill, which so far have exceeded $100 million.  Thus far, BP has

also paid $150 million in "block grants" to affected Gulf states to fund their efforts, and it

has agreed to fund the full $360 million necessary for Louisiana to build sand berms

along its barrier islands to protect sensitive inland marshes and bays.

i.     In addition to all the foregoing, BP has already paid or committed

to pay hundreds of millions of dollars in miscellaneous payments stemming from the

Deepwater Horizon incident, including $55 million in payments to Gulf states to promote

their flagging tourist industries, a $100 million fund (against lost earnings that have been

projected by economists to fall between $200 million and $450 million) to compensate

oil rig workers left jobless by a six-month moratorium on all deepwater drilling, and a

$500 million research program studying the impact of the Deepwater Horizon incident

and BP's response on the waters and shores of the Gulf.  BP also said that it will donate

the net revenue from any oil captured and sold from its blown well to a wildlife fund for

affected Gulf states.  In addition, BP may face extensive future liabilities that cannot be

identified or quantified today related to the tactics and execution of its containment,

cleanup and restoration efforts.

77.     Against these liabilities, in addition to its quarterly earnings, BP had as of

June 4, 2010 just $5 billion in cash, plus access to $5.25 billion in undrawn committed

bank lines and $5.25 billion in committed stand-by bank lines.  The sheer magnitude of

its growing and uncertain exposure from the Deepwater Horizon disaster prompted BP on

June 16, 2010 to suspend its dividend for at least the rest of 2010 (after having paid out

$10.5 billion in 2009 dividends) in an effort to hoard cash.  This was the first time since

World War II that BP failed to pay a dividend.  On June 20, 2010, Bloomberg News

quoted BP head of communications Andrew Gowers admitting, "We need to have an

unusually strong cash position."  On June 21, 2010, *Investment Week*, quoting the Sunday

Times, reported that BP is seeking to raise $50 billion, via a $10 billion bond sale a week

later, $20 billion in bank loans, and $20 billion in asset sales.  No one can predict

whether and to what extent these steps will succeed.  Indeed, on June 26, 2010, Reuters

reported that BP had for the time being scrapped its planned bond sale.

78.     Fourth, throughout this crisis, BP has suffered immense reputational

damage, rapidly emerging as an unsympathetic villain increasingly under fire by the U.S.

government and isolated in the business community.  Public outrage at BP's inability to

cap its blown well has been fueled not only by scientific analysis of damage to the Gulf,

but also by public disclosure of BP documents revealing the degree to which it had

prioritized cost savings over safety before the spill and by the high-profile missteps by

BP's management post-spill that led to its CEO being removed from day-to-day cleanup

control on June 18, 2010.  In Congressional testimony on June 15, 2010, the other large

oil companies cast BP as a pariah that operated outside accepted industry practices.  For

example: ExxonMobil CEO Rex W. Tillerson testified, "We would not have drilled the

well the way [BP] did."; Chevron chairman John S. Watson testified, "It certainly

appears that not all the standards that we would recommend or that we would employ

were in place."; and Shell president Marvin E. Odum testified, "It's not a well that we

would have drilled in that mechanical setup."

     79.    Now, other companies with potential liability for the Deepwater Horizon

spill, and their insurers, are actively attempting to isolate BP to shoulder the entire

burden alone.  For instance, Jim Hackett, CEO of Anadarko Petroleum Corp., the 25%

minority owner of the Macondo well which is itself under pressure by Congress to pay

into BP's $20 billion claims fund,[4] pointed fingers squarely at BP, saying in a June 18,

2010 statement, "BP's behavior and actions likely represent gross negligence or willful

misconduct and thus affect the obligations of the parties."  Citing documents showing

that BP failed to heed "several critical warning signs" during drilling, Hackett added that

Anadarko will look to BP to pay all claims from the spill, because "The mounting

evidence clearly demonstrates that this tragedy was preventable and the direct result of

BP's reckless decision and actions."  On June 25, 2010, a *Wall Street Journal* legal blog

reported that Lloyd's of London, insurer for Transocean, the owner of the Deepwater

---

[4]  The other minority owner of the Macondo Prospect is Mitsui & Co., which holds a 10% stake through a majority-controlled subsidiary.  As of June 19, 2010, Mitsui has said that drawing any conclusions about the escrow account or underlying matters "would be premature."

Horizon rig, had asked a federal court to declare that it would not have to cover BP's

excess liability for cleanup and other costs because a sub-surface spill was beyond the

scope of its contract.

80.     The foregoing factors, which translate into potentially limitless financial

liability for BP, have at all relevant times posed a significant threat to its future viability

as an independent concern, rendering an investment in BP stock imprudent as of April

20, 2010 and consistently thereafter.  For that reason, since the beginning of the

Deepwater Horizon crisis, major credit rating agencies, securities analysts and investment

managers have openly questioned BP's ability to survive this crisis.

### *BP's debt spreads, credit-default swap prices, and credit ratings*
### *have been relentlessly hammered ever since the Deepwater Horizon spill began*

81.     The major credit rating agencies have swiftly downgraded BP as the

Deepwater Horizon crisis has unfolded, struggling to keep pace with the quality

degradation priced into BP's debt and credit-default swaps by the market itself.  These

downgrades have materially weakened BP because its cost of funding rises inversely to

the decline in its credit rating.  This set of circumstances, which has rendered an

investment in BP stock imprudent since April 20, 2010, is summarized as follows.

82.     On April 30, 2010, Fitch Ratings ("Fitch") issued a report in which it

anticipated that BP would be negatively impacted by the containment and cleanup costs

of the spill.  Its analysis was as follows:

> [I]t is currently too early to quantify other potential costs and liabilities,
> and, as a result, the ultimate financial impact on BP will depend on how
> the environmental and economic impact develops when the spill reaches
> land, given its close proximity to the US Gulf coast.

* * *

Yesterday, US President Obama said that the US government is not in a

position to assist with the cost of the containment and clean-up, despite
having deployed the US military to the area to contain the rapidly moving
oil spill.  The president stated that the responsibility for bearing the cost
will ultimately be BP's, and Fitch anticipates the US government will
attempt to reclaim its costs from this operation from BP.

83.     On May 5, 2010, Moody's Investors Service ("Moody's") announced that

it had "revised to 'negative' from 'stable' the outlook on the Aa1 senior unsecured

ratings of BP plc and its guaranteed subsidiaries, and the Aa2 long term issuer ratings of

BP Corporation North America, Inc. and BP Finance plc."  Its rationale:

> Moody's action reflects the considerable uncertainty associated with the
> financial liabilities and clean-up costs that BP may incur as a result of the
> oil spill in the Gulf of Mexico caused by the explosion on the Transocean
> Deepwater Horizon drilling rig. … [I]t remains impossible at this stage to
> assess the full extent of the costs and business impact of this accident on
> BP's results.

Moody's said its action affected about $25.8 billion of BP debt, that it would monitor BP,

that BP faced significant reputational risk, and that Moody's would place BP under

review for another downgrade if BP continued to face similar financial uncertainty from

the Deepwater Horizon spill.

84.     On May 6, 2010, DBRS stated its belief, "based on currently available

information" that BP could absorb the impact of the Deepwater Horizon spill while

remaining at its then-current rating of "AA (high)."  It clarified: "However, should the

potential total liability estimates escalate significantly, negative rating action could occur.

 DBRS will continue to monitor and assess the situation and take appropriate action as

more information becomes available."

85.     On May 7, 2010, Standard & Poor's ("S&P") changed its outlook on BP

plc to "negative" from "stable" likewise indicating that a rating downgrade was more

likely, due to the uncertain costs and reputational risk faced by BP stemming from the

Deepwater Horizon spill, as well as the likelihood of increased regulatory scrutiny. S&P

said that "any long-term reputational damage [to BP] could be significant" and that a

prolonged cleanup process and high litigation costs could result in a BP downgrade.

86.  On May 13, 2010, S&P issued a report indicating that it may take

additional ratings actions regarding the Deepwater Horizon oil spill. The rationale was

as follows:

> "Potential financial liabilities arising from litigation and limiting and
> cleaning up the oil spill, the likelihood of increased regulatory scrutiny for
> all offshore operations in the Gulf of Mexico, and the potential
> reputational damage for the companies involved in the incident are key
> factors behind our recent outlook revisions," said Standard & Poor's credit
> analyst Paul Harvey.
>
> Operational and estimated environmental clean-up costs, which could
> exceed $3 billion, constitute the immediate financial risk to the
> companies' credit profiles. Costs and damage will continue to mount until
> the spill is controlled. However, in our view, potential non-environmental
> liabilities could pose longer-term risks to their credit profiles. These
> liabilities include any potential litigation from business or property
> damage, escalating insurance premiums, and the likelihood of increased
> costs due to greater environmental impact on the U.S. Gulf Coast's
> fisheries and other habitats could be substantial, particularly if the waters
> contaminated by oil reach the coastline.
>
> "We currently believe the companies involved should be able to fund the
> estimated near-term clean-up costs at current rating levels given their
> strong liquidity and our expectations for solid cash flow because of the
> favorable crude oil prices," said Mr. Harvey. "However, if the spill
> affects the shores of the Gulf region, we believe it is likely that the
> environmental remediation costs and litigation would escalate and have a
> negative impact on the credit profiles of the companies."

87.  As reported by Bloomberg News, according to Bank of America Merrill

Lynch's energy industry index, by June 1, 2010, BP's bonds were trading in line with

debt rated as much as five levels lower, as investors demanded an average yield premium

of 148 basis points to buy BP bonds rather than government debt. This was almost

double the spread on notes sold by industrial companies with published ratings comparable to BP's at the time and nearly four times BP's average bond spread before the Deepwater Horizon spill.  Also on June 1, 2010, credit default swap contracts on BP rose to a record 136 basis points according to CMA Datavision prices in London.  Bloomberg quoted Joel Levington, managing director of corporate credit for Brookfield Investment Management, Inc., as saying, "Investors have ratcheted up their yield requirements for elevated risk to BP. … For investors, they have to decide what their time horizon is. There's obviously a lot of short-term volatility in that name."

88.    On June 2, 2010, DBRS "placed the 'AA (high)' Issuer Rating of BP plc Under Review with Negative Implications as the Company's series of operations to stop the oil spill, started on April 20, 2010, from its operated Macondo well in the Gulf of Mexico have been unsuccessful."  It elaborated:

> The Company cannot provide assurance that the current joint effort with the U.S. authorities and industry experts to cap the leaking well using the containment system can stop the flow of oil.
>
> With the lack of success to date of the various measures (including surface containment, various subsea containment and collection attempts, and the latest "top kill" procedure), there is now a higher probability that the oil spill could continue until a relief well is complete and successful.  The latter is expected to occur in early August, noting the potential effect of the operation during the hurricane season.
>
> The rating action reflects a higher level of uncertainty since the time of DBRS's last commentary on May 6, 2010, attributable to the unsuccessful mitigating actions of BP and the continued uncertainty of the financial and business impact of the oil spill on the Company's financial flexibility, credit metrics and future operations.
>
> DBRS is cognizant of BP's financial strength and its comprehensive response effort together with all the concerned parties involved.  However, there are no reliable estimates of the extent of the clean-up costs and potential liabilities associated with the spill, which could escalate considerably in the foreseeable future, especially in view of potential

regulatory and other changes that could affect the existing cap on liability for economic damage from a spill.

89.     On June 3, 2010, Fitch announced that it had "downgraded BP's Long-

term Issuer Default Rating (IDR) and senior unsecured rating to 'AA' from 'AA+'…and

placed the ratings on Rating Watch Negative (RWN)."  Also, Fitch announced that, "The

ratings on BP Capital Markets plc's senior unsecured issues, which are fully and

unconditionally guaranteed by BP, have been downgraded to 'AA' from 'AA+' and

placed on RWN."  The downgrade was explained as follows:

> The downgrade of BP's ratings reflects Fitch's opinion that risks to both
> BP's business and financial profile continue to increase following the
> Deepwater Horizon accident in the US Gulf of Mexico.  The company has
> so far repeatedly failed to stop the resultant oil leak and has instead
> reverted to containment methods that are yet to be fully implemented and
> are subject to potential weather related disruption.  Fitch notes that the
> drilling of relief wells also poses risks and additional time may be required
> for them to be fully effective.  An additional factor supporting the
> downgrade is the 1 June 2010 announcement by US Attorney General,
> Eric Holder, that both a criminal and civil investigation has opened with
> respect to the oil spill that could have potential negative implications for
> BP's financial profile.

> The placement of the company's IDR and senior unsecured ratings on
> RWN reflects Fitch's concern that BP is still facing substantial additional
> risks in relation to the oil spill.  Factors that could lead to possible further
> downgrades of BP's ratings include, but are not limited to, the actual oil
> well flow rate (as opposed to the US government's estimated revisions)
> permanently increasing; the failure of the relief well currently being
> drilled by BP to completely arrest the oil flow from the leaking well in a
> timely fashion; and clean-up costs exceeding Fitch's worst case
> expectations of around USD5bn in any one year.

> Additional factors which also support the RWN include the possibility of
> US legislative changes that materially widen BP's immediate payment
> responsibility beyond containment and clean-up (eg, long-term
> unemployment benefits to affected Gulf coast residents, job training and
> added costs of environmental tests beyond the USD500m already pledged
> to the company); and BP permanently halting drilling activity in the Gulf
> of Mexico.

Fitch's understanding remains that, as 65% owner of the well, BP is primarily responsible for funding clean-up operations in relation to the Deepwater Horizon accident.  Fitch continues to anticipate that these operations could reach costs of USD2-3bn in 2010 for the company, depending on how much oil eventually reaches the US shoreline.  Fitch remains concerned that despite the current high oil price environment that supports the strength of the company's balance sheet to finance the cost of the spill response, BP could face potential criminal or civil penalties.  Specific negative rating action, however, would depend on the size and timing of these payments.

90.    Also on June 3, 2010, Moody's announced that it "downgraded the senior unsecured ratings of BP plc and its guaranteed subsidiaries by one notch to Aa2 from Aa1, and the long-term issuer ratings of BP Corporation North America, Inc. and BP Finance plc to Aa3 from Aa2" and that it placed these BP long-term debt ratings on review for further possible downgrade.  The downgrade rationale was explained as follows:

Today's downgrade of BP's long-term debt ratings reflects Moody's expectation that the protracted oil spill in the Gulf of Mexico, caused by the explosion on the Transocean Deepwater Horizon drilling rig, will result in significant containment and clean-up costs as well as litigation costs.  Moody's expects these costs to weigh significantly on BP's free cash flow generating capacity and to constrain its ability to focus on other key areas of the company's business in the near to intermediate term.

Moody's also believes that the Macondo accident represents a further setback to BP's ability to overcome past operations issues.  Additionally, the accident will hamper BP's ability to reposition its financial metrics more solidly at the Aa1 rating level.

91.    On June 4, 2010, S&P announced that it had downgraded BP's long-term rating to "AA-" from "AA," that it was placing its long- and short-term corporate credit ratings for BP on CreditWatch negative, and that further BP downgrades were possible. S&P analyst Simon Redmond said, "The downgrade reflects our opinion of the significant operational challenges BP continues to face to stem or contain the leak" from

the Deepwater Horizon well.  The downgrade rationale was explained as follows:

> Our rating action reflects, in particular, our view on; the costs to BP in 2010 for capping the well and cleaning up; the level of any longer-term compensation, litigation, or fines; the potential for increased regulation and scrutiny of the U.S. offshore industry; and the impact on BP's reputation and brand.  While the scope and consequences of the spill are still uncertain, this event is, in our opinion, not consistent with the scenario we had factored into the previous 'AA' rating, hence the downgrade.

> Since we revised the outlook on our long-term rating on BP to negative on May 7, 2010…, the company has mounted a number of unsuccessful attempts to stem the well.  BP's most recent estimate of gross costs to the beginning of June is $990 million.  We expect the likely costs of capping and clean up alone to amount to several billion dollars, partly depending on how much time BP will need to gain control over the oil flow.  The eventual total cost of the incident could be far higher, although it could be payable over a number of years.

> We see a risk that events leading up to and following the oil spill may result in lasting impairment of BP's business and financial risk profiles, which we currently assess as "excellent" and "minimal," respectively.  We also see the prospect of a more difficult operation environment in the U.S., BP's largest market by far.  We understand that federal investigations have yet to determine the exact chain of events that led to the spill.

92.     As of June 7, 2010, as reported by Bloomberg News, BP's bonds were

trading as though they were ranked BBB, five steps lower than they were actually rated

by the rating agencies at the time, according to Bank of America Merrill Lynch's energy

industry index.  Bloomberg noted that BP's 3.875% notes due in 2015 yielded 3.02

percentage points more than similar-maturity Treasuries and quoted Nicholas Finkelman

at New York money-management firm Ryan Labs, Inc. as saying, "The spread implies

that [BP's] already a BBB company….   Until there's stability in the name, it's best to

watch from the sidelines."  That day, Moody's issued a report in which it stated, "We

expect the total containment and cleanup costs as well as litigation costs arising from the

disaster…will weigh significantly on BP's free cash flow."

93.     Barrons and Markit reported on June 9, 2010 that BP's credit default swaps surpassed 300 basis points for the first time and approached "an amazing 400 basis points" despite its credit rating.

94.     On June 10, 2010, when BP's stock hit a 13-year low in London trading, Bloomberg News reported that "BP plc bonds and credit-default swaps are trading as if the energy company has lost its investment-grade rating as costs mount from the worst oil spill in U.S. history."  Bloomberg noted that BP's $3 billion of 5.25% notes due in 2013 fell to a record low, driving the yield to 7.57 percentage points more than Treasuries and, citing Bank of America Merrill Lynch's energy industry index, observed that such yield compared to junk bonds.  Citing CMA DataVision, Bloomberg noted that the cost to protect $10 million in BP debt for a year with credit-default swaps more than doubled during just the previous two days, to $734,000 – as compared to just $29,000 on April 30, 2010.  Bloomberg stated that BP's credit-default swaps implied a Ba2 rating for BP, nine steps lower than its actual Moody's rating at the time, and quoted Michael Donelan, who oversees $3.5 billion in bonds at Ryan Labs, Inc. as saying, "That's just pure out panic. That's like, 'Get me out of here now.'  What the market is pricing in now is increased regulatory oversight and heavy, heavy punitive damages."

95.     Also on June 10, 2010, an article entitled "Is BP About to Fail?," available via *Seeking Alpha*, observed that "Credit spreads are forecasting increasing near-term solvency risks in shares of BP" and that "The term structure in CDS has severely inverted implying a very high risk of near-term default."  Another article on TheStreet.com, noting that BP shares were trading below book value, said, "It's hard to distinguish between big institutional investors selling on fears that their BP dividend income is about

to become extinct, and investors fearing the worst, that BP will join the list of the extinct,

or at least bankrupt, companies soon enough."

96.     On June 11, 2010, Richard Birrer, an analyst at BNP Paribas SA in

London wrote regarding BP bonds that "current levels are pricing in enormous unknowns

and seemingly unquantifiable future damage liabilities."

97.     On June 15, 2010, Fitch announced a series of tremendous, six-level BP

downgrades.  Specifically, Fitch announced that it had "downgraded BP plc's Long-term

Issuer Default Rating (IDR) and senior unsecured rating to 'BBB' from 'AA'…and

downgraded the Short-term IDR to 'F3' from 'F1+'.  The Rating Watch on all ratings has

been changed to Evolving (RWE) from Negative (RWN)."  In addition, "BP Capital

Markets plc's senior unsecured issues, which are fully and unconditionally guaranteed by

BP, have been downgraded to 'BBB' RWE from 'AA' RWN."  Fitch's reasoning behind

its massive single-shot downgrades, which left BP just two levels above junk bond status,

were explained as follows:

> The scale of today's rating action has been partly driven by the increased
> risk that the balance between long-term and near-term cost payments may
> now be skewed much more heavily towards the near-term than previously
> anticipated by Fitch….  In particular, the recent claims by U.S. state and
> federal authorities that BP escrow significant sums pre-emptively, ahead
> of any agreed claims process, represent a material change in approach….
>
> The following commentary outlines 1) principal drivers for today's
> downgrade, 2) the nature of potential financial impact from the oil spill on
> BP, 3) the significance of capital markets access, and 4) the high level of
> uncertainty as to the scale of estimated costs and subsequent rationale for
> the RWE.
>
> - Principal Drivers for Downgrade
>
> The principal changes in circumstances since Fitch's downgrade to 'AA'
> RWN include: 1) the indication late last week from US government
> scientists of a significantly higher spill rate than previously announced by

all parties, which Fitch expects will materially increase BP's exposure to Justice Department fines payable in the near to medium-term, and 2) the significant step-up in action from the U.S. government surrounding calls for pre-emptive escrowing of damage claims.  Both of these events have a direct bearing on BP's fundamental financial flexibility.

- Nature of Potential Financial Impact from the Oil Spill on BP

Fitch's review of the potential financial impact of the spill can be grouped into four time-lines:  1. Immediate ongoing direct clean-up costs and claim settlements related to the spill;  2. Near- to medium-term civil fines related, in part, to the scale of the oil flow rate;  3. Medium-term wider financial impact on BP's operations, including higher operating costs, lower revenues from the loss of access to projects following reputational damage; and 4. Long-dated litigation –related damages.

Fitch's expectations for these payments based on its analysis of prior oil industry incidents, information from industry sources and reports in the general and specialized press, range as follows:

1.  Immediate clean-up and claim settlements: Latest estimates from the company are in the range of USD3bn to USD6bn. This is an increase on Fitch's estimate on 3 June 2010 of USD2bn to USD3bn.

2. Near-to medium-term civil fines for the oil discharges or, if BP were found to have committed gross negligence or willful misconduct higher civil fines: these payments are expected to be quantified and payable in the near- to medium-term and are currently estimated by Fitch at the lower range of USD2bn  or higher fines of around USD8bn (BP's share) respectively.  These estimates are based on 90 days of mid-point flow rates of 30,000 barrels per day (bpd) until the riser cap was removed on 4 June 2010 then 25,000 bpd until scheduled completion of the relief wells in early August 2010.

The mid-point flow rate of 25,000 bpd represents Fitch's anticipation that the US government scientists (the Flow Rate Technical Group) may increase their estimated of the flow rate again following additional analysis of the impact of the riser cap being removed and BP continuing to capture 15,000 bpd on average.

3. Consensus medium-term incremental one-off costs thus far related to the clean-up have been cited as in the region of USD1.4bn. No estimates of the current operational cash flow impact across the broader group are currently available, and Fitch believes it is too early to make a meaningful assessment, but as an order of magnitude, a 1% increase in BP's North American operating costs would amount to an increase of around

USD0.7bn p.a.  Exposure to lost revenues in the U.S. downstream is
regarded as minimal.

4. Fitch anticipates that long-dated litigation-related damages would be
subject to lengthy court proceedings and, given the precedent of Exxon
Valdez, large amounts would be payable and contested over many years.

- Significance of Capital Market Access

The increased skewing of potential costs to the near-term is compounded
by the limitations the severely adverse market reaction towards BP in
recent weeks will pose to the company in accessing the full range of
capital markets.

BP's liquidity position as at the last investor conference call (4 June 2010)
was USD5bn of available cash across the group, USD5.25 bn of undrawn
committed bank lines, and USD5.25bn of committed stand-by bank lines.
Using Fitch's forecasts, the group's free cash flow before dividends for
2010 is USD6bn.  This analysis does not include the potential to monetize
existing assets.

In addition, Fitch would be surprised if BP did not suspend quarterly cash
dividend payments until the operational and financial impact of the
incident is clearer.  The agency expects BP's syndicated bank group to
permit drawings under the group's liquidity facilities (to the extent that
they are contractually committed to provide funds) should BP choose to
do so.  Both of these actions would be supportive of the group's liquidity
position.

* * *

-Uncertainty Surrounding Assumptions and RWE Rationale

Given the fluidity of events, a high level of uncertainty remains in the
scale and ultimate realization of the payments outlined above,  It is still
possible that payments may either turn out to be much lower than Fitch's
expectations, or that they may be skewed more to the long-term, both of
which would be favorable for BP's credit profile.  In particular, a swift,
positive resolution of the competing claims from the U.S. state and federal
level for the pre-emptive escrowing of damage claims would have a
material positive effect on the ratings.

That said, today's multi-notch downgrade does not assume that all claims
currently reported in the media will result in near-term or ultimate
payment by BP.  Both individually and collectively, there exists
insufficient definition around claims to currently judge their likelihood or

final severity.  At the current time, and at the levels now being contemplated, they nonetheless represent an increasing number of severe financial challenges to the company.

While Fitch does not anticipate that the incident will translate to the worst case scenarios – including the placement of parts or all of BP into insolvency or restructuring proceedings – the possibility of further, potentially multi-notch rating actions arise from the potential for 1) yet higher financial claims under all of the above listed scenarios, 2) the acceleration of individual exposures into immediate cash demands of one form or another that would be inconsistent with and overall rating profile in the 'BBB' category, and 3) BP's access to capital to constrict in an already challenging financing environment.  Any deterioration in operating cash flow would also influence the liquidity position identified above.

As a result, Fitch considers the level of uncertainty itself now to be incompatible with the previous 'AA' strong investment-grade credit ratings, and also to justify the continuation of a Rating Watch on all of BP's ratings.

As described above, Fitch will monitor for either an increase in any of the individual categories of payments, but, more especially, the degree to which any of the timing of those payments is accelerated.

98.    In the wake of the Fitch downgrades, Bloomberg News reported that BP's bond yield premiums and credit-default swaps surged upward.  Andrew Brenner at Guggenheim Securities was quoted by MarketWatch, Inc. as saying that "BP bonds are getting crushed today."

99.    On June 16, 2010, CNN Money, citing CMA DataVision, reported that the annual cost to protect against default on $10 million worth of BP debt for five years had risen to $591,000.  Bloomberg cited CMA prices and an International Swaps and Derivatives Association model that is used as a valuing standard in reporting that BP's credit-default swaps soared as of June 16, 2010 to levels implying traders had priced in a 40% chance that it would default in the next five years.  Bloomberg quoted Tim Backshall, chief strategist at Credit Derivatives Research LLC, as attributing the swap

surge to creditors and trading partners seeking to hedge against losses "at any cost."

Bloomberg also reported that BP debt due next year was trading at "distressed levels,"

"with investors demanding as much as 1,251 basis points in yield more than Treasuries."

100.     On June, 17, 2010, S&P announced that it "lowered its long- and short-

term corporate credit ratings on…BP plc to 'A/A-1' from 'AA-/A-1+'.  The ratings

remain on CreditWatch…."  S&P's downgrades were explained as follows:

> "The downgrade reflects our opinion of the challenges and uncertainties
> that BP continues to face in the aftermath of the explosion on the
> Deepwater Horizon rig in the Gulf of Mexico on April 20, 2010, and the
> subsea Macondo well blowout," said Standard & Poor's credit analyst
> Simon Redmond.  "These challenges and uncertainties include the
> difficulties BP is experiencing in containing the spill as well as the
> ultimate extent of the pollution, the consequences for BP of ongoing
> official investigations, and the implications of these investigations for the
> magnitude and timing of further cash payments by BP."
>
> BP is now subject to intense political pressure in the U.S., its largest
> market.  We see these factors as fundamental issues differentiating BP
> from its peers.

101.     Also on June 17, 2010, DBRS announced that it had downgraded the

Issuer Rating of BP plc to "A (high)" with the rating remaining Under Review with

Negative Implications.  The downgrade was explained as follows:

> The rating action reflects two material changes that have occurred since
> the last BP rating action (a downgrade to AA (low) and maintenance of
> the Under Review with Negative Implications status), namely: 1) the
> announcement of the establishment of a $20 billion claims fund; and 2) a
> significant increase in spill flow rate estimates.  The rating has been
> downgraded due to the fact that the increased spill rate estimates have
> raised the level of uncertainty surrounding the ultimate liabilities, and the
> funding of the claims fund reduces the Company's financial flexibility.
> While neither a cap nor a floor, $20 billion is a very sizeable amount.  The
> current rating level incorporates the assumption that the current relief well
> efforts will be successful, and recognizes the operating and financial
> strength of the Company, as well as its substantial liquidity commitment

to take responsibility for the spill.

The rating remains Under Review with Negative Implications given the continued significant unknowns, including: 1) the uncertainty regarding the timing of the effort to completely stop the flow, which depends upon the relief well being successfully completed (expected in August); and 2) the continued significant level of uncertainty surrounding the ultimate extent of the spill-related liabilities.  While the $20 billion claims fund may serve to reduce political pressure, it does not provide any additional certainty as to the extent of BP's ultimate spill-related costs.  How the Company funds the expenses over the longer term will also determine the extent of the impact on the Company's creditworthiness.

BP announced that it will create the $20 billion claims fund, to be financed according to a set schedule ($5 billion in total in 2010, and $5 billion in each of 2011, 2012, and 2013 (paid quarterly)).  The claims fund will be available only for damage claims and local response costs and specifically excludes fines and penalties which will be paid separately, and is not for the ongoing spill mitigation and clean-up costs.  Payments from the fund are to be adjudicated either by and Independent Claims Facility, BP or court order.  BP will secure its fund obligation by "setting aside" U.S. assets with a value of $20 billion, with the level of pledged assets declining as BP makes cash payments to the fund (details of the asset pledge are unknown at this time).  BP also announces the cancellation of its first quarter dividend and suspension of its next two quarterly dividend payments (approximately $2.6 billion per quarter), stating that it will reconsider its dividend policy in 2011 when it has more insight as to the longer-term impact of the spill.  In addition to the dividend suspension, the Company cited various other sources of liquidity, including: 1) committed credit facilities exceeding $10 billion; 2) annual cash flow from operations in excess of $30 billion at current pricing (excluding spill related costs); 3) a reduction in capital expenditures; and 4) planned asset sales of $10 billion over the next 12 months.  BP also had cash on its balance sheet or approximately $7 billion as of March 31, 2010.  While these mitigating efforts are positive for near-term liquidity, the funding of the $20 billion claims funs, on top of the ongoing spill mitigation and clean-up costs, has accelerated BP's cash needs and in DBRS's view had reduced the Company's financial flexibility and ability to handle any other unexpected cash requirements.

Estimates of the spill flow rate have increased materially, with recent government estimates of between 35,000 and 60,000 barrels/day.  In addition to likely increasing the direct clean-up costs and potential claims, increased flow rates could expose BP to significantly higher fines that may be imposed by federal entities.

DBRS will continue to monitor the situation with the rating expected to remain Under Review with Negative Implications until more clarity is reached regarding the timing of the complete stoppage of the spill, more reliable estimates of the extent of the clean-up costs and potential liabilities are available, and BP's longer-term funding plan is known.

102.     On June 18, 2010, Moody's cut its ratings on $25 billion of rated BP debt securities.  Moody's slashed by three notches its rating on BP's senior unsecured debt from "Aa2" to "A2," lowered the unsecured issuer rating of BP Corporation North America, Inc. by four notches to "Baa1" from "Aa3," and dropped the senior unsecured issuer rating of BP Finance plc by three notches to "A3" from "Aa3."[5]   It kept the ratings under review for additional potential downgrade.  Moody's also placed on review for possible downgrade the Prime-1 short-term rating for BP and subsidiary debt obligations that are guaranteed by BP.  A Managing Director at Moody's, David Staples, said, "Substantial uncertainties remain as to what the costs of the spill will be."  The downgrade rationale was summed up as follows:

The downgrade of BP's long-term ratings reflects the worsening impact expected from the oil pouring into the Gulf of Mexico from BP's subsea Macondo well.  Moody's updated assessment is that the spill will have a sustained negative impact on the group's free cash flow generation and overall financial profile for a number of years.  This assessment reflects a substantial upward revision of the estimated size of the leak, the continued failure to bring the leaking Macondo well under control, and the mounting costs and claims from damages. Moody's believes that costs for containment, clean-up, litigation and fines are likely to be higher than the rating agency had previously expected in view of the widespread and continuing physical and economic damage.

Moody's views the agreement reached between BP and the US government for the creation of a USD20 billion fund by BP to satisfy legitimate claims to be assessed by independent third parties as a mildly positive development. Establishing a clear funding mechanism to make

---

[5] On June 18, 2010, Moody's also downgraded the long-term debt rating on Anadarko, BP's 25% minority partner in the Macondo Prospect, to non-investment grade, dropping it from "Baa3" to "Ba1," with further reductions possible.

payments to injured parties may moderate pressure for the government to pursue more punitive actions.  Moody's views the staggered contributions to be made by BP into the fund over the next three and a half years as manageable from a liquidity perspective, considering the strong cash flow generated from its global operations and the various measures BP has announced to conserve cash. These measures include the suspension of dividends, significant cuts in capital spending and an increase in planned divestments to approximately USD10 billion over the next 12 months.

Moody's cautions that the agreement over the USD20 billion claims fund does not in any way cap BP's potential liabilities.  Indeed, the rating agency believes that uncertainty over the ultimate cost for massive litigation claims and other contingent liabilities will be an overhang on BP's creditworthiness that will persist for years to come.

The four-notch downgrade of the BPCNA's Issuer Rating, which is a measure of its stand-alone credit strength (as distinct from the BP p.l.c. guaranteed debt ratings) to Baa1 from Aa3, considers that the subsidiaries of BPCNA hold the group's Gulf of Mexico assets.

All ratings remain on review for possible further downgrade.  Moody's review will focus on : (1) BP's efforts to cap the well and bring a halt to the escalation in environmental and economical damage after which it will be possible to make a more complete assessment of costs; (2) developments with regard to the investigation and judicial process currently underway and the insights these provide on the group's litigation exposure; (3) details of the security arrangements to be put in place to back-stop BP's USD20 billion commitment; (4) legal structure considerations, including an updated assessment of assets and liabilities of US subsidiaries; and (5) the allocation of liability for the accident and the potential for the sharing of compensation claims by BP's partners in the Macondo well.

In addition, while recognizing that BP is the largest operator and producer in the Gulf of Mexico, Moody's will also see to ascertain how the spill may affect (1) BP's long-term business prospects in the US, particularly in the Gulf of Mexico; (2) future drilling and producing costs in the US and other deepwater provinces around the world; and (3) how these factors will affect BP's business profile and future financial performance.

103.    The foregoing has had a tremendous impact on BP's cost of funding.  For example, on June 21, 2010, Bloomberg News called BP "the worst oil investment this year on Wall Street" and reported that BP "would face an extra $500 million a year in

interest costs to raise $10 billion in the bond market."  Bloomberg quoted Gary Jenkins as indicating "Any large bond deal would be problematic for BP as it's impossible to assess their potential liabilities."  Bloomberg also quoted Matrix Corporate Capital LLP debt markets specialist Charles Stephens as writing that a "jumbo" bond issue from BP "will make for fascinating pricing discussions, given the highly uncertain scale of BP's liabilities, and hence its credit quality."

104.    On June 25, 2010, the *Wall Street Journal* reported that BP's bond yields rose to record highs, as debt traders sold BP bonds amid concerns it might need to sell additional shares, and that the cost of insuring $10 million of BP debt for the next year had risen to $725,000, according to data provided by Markit.  The same day, Bloomberg reported that BP credit-default swaps had risen to a record 591.7 basis points, according to CMA Datavision.

105.    On June 28, 2010, Bloomberg, citing CNBC, reported that, because of recent downgrades on its debt, Credit Suisse Group AG had demanded that BP post collateral to borrow over $10 million.  The same day, Bloomberg reported that BP had to pledge $840 million of shares in Russian oil producer OAO Rosneft to secure a $2 billion loan for use in battling the Gulf oil spill.

### *Amid BP's Rising Spill Exposure and Cratering Stock Price, Securities Analysts and Investment Managers Have Increasingly Questioned BP's Ability to Survive*

106.    Securities analysts and investment managers have likewise issued a steady drumbeat of downgrades, negative commentary, and rampant speculation as to the actual value of BP's shares in lockstep with the company's prolonged inability to halt the massive Deepwater Horizon spill.  Their focus rapidly shifted away from a micro-analysis of the particular tactics unsuccessfully employed by BP to cap its blown well, all

of which failed, and, in the face of withering pressure by the U.S. government, have increasingly focused instead on BP's ability to withstand a takeover by rivals and/or avoid Chapter 11 bankruptcy protection.  A sampling of such statements, which further demonstrate the imprudence of an investment in BP stock, follows.

107.    On April 30, 2010, *Bloomberg News* reported that Sanford C. Bernstein & Co. analyst Neil McMahon estimated the total potential spill costs at up to $12.5 billion, with BP's share being $8 billion.  The same day, *the New York Times* reported that Wall Street experts said that it was impossible to accurately estimate how much the spill will eventually cost.  UBS AG analyst Jon Rigby said in a note to clients, "The problem for equity investors is the uncertainty" about the potential financial cost to BP and "the incident is so unprecedented, the legal and reputational issues are also impossible to judge at this stage."  Discussing the growing reputational threat, Oppenheimer analyst Fadel Gheit said, "In the last two years, it seemed BP had really cleaned up their act. Now it looks like a house of cards that has totally collapsed."

108.    On May 3, 2010, Douglas Christopher of Crowell, Weedon & Co. issued a report in which he rated BP as "Avoid/Sell"  His rationale was as follows:

> We believe that the current news on the BP/Transocean deep water rig catastrophe and the involvement of the Obama administration, Homeland Security, Energy Czar, State Governments, the Military and Coast Guard, etc., ensures that the Gulf of Mexico cleanup will cost billions of dollars. The explosion is already becoming a hot button for energy and environmental politics.  BP does not have insurance for the spill and, and as headlines indicate, will be financially responsible for all the clean up. Given the real and potential risks, we would avoid BP shares. Conservative investors should consider reducing BP exposure.

109.    On May 5, 2010, the *Washington Post* reported that energy investor Matthew Simmons said BP may be destroyed by the spill, because it has to clean up the

Gulf and he did not believe it will be able to stop the spill until the Macondo reservoir runs out.

110.    A May 8, 2010 article in the Oil and Gas Journal quoted FBR analysts as saying "BP's bill will be unknown for some time" and that they were more interested in "what, if any, punitive or preventative actions" the government would take against BP.

111.    On May 10, 2010, ING analyst Jason Kenney said, "There's going to be a lot of volatility in BP's share price for months to come.  Investors have to make a decision if they want to be exposed to that volatility or get out until things calm down." The same day, David Kotok, chairman and chief investment officer of Cumberland Advisors, stated, "This will be a financial calamity for many firms, not just BP and its partners and service providers.  Their liabilities are immense and must not be underestimated."  Oppenheimer analyst Fadel Gheit called the spill "a major disaster with catastrophic implications not only for the companies involved, but also for the offshore oil industry and the economies of the Gulf coast."

112.    On May 13, 2010, David Kotok, chairman and chief investment officer at Cumberland Advisors, said regarding the spill, "This whole thing is a monster that's going to take years to resolve."

113.    On May 25, 2010, a day after BP CEO Tony Haywood admitted that the spill was a "major reputational issue" for BP, Independent Research GmbH equity analyst Sven Diermeier downgraded BP to "Sell" from "Hold."  *The Wall Street Journal* quoted Will Riley, co-manager of Guiness Atkinson Global Energy Fund, as saying that "The risk for BP is that the U.S. government will constrain BP's activities.  Deepwater is very important to their future growth."  Reuters and the *Guardian* both reported that

environmental penalties could already range from $10 billion to $60 billion, depending on the oil flow rate.

114.    On May 26, 2010, analysts at Canaccord Genuity estimated a worst-case scenario of fines by the U.S. E.P.A. totaling £42 billion, based on a finding of gross negligence and an estimate of 115,000 barrels of oil a day leaking for 120 days.

115.    On June 1, 2010, BP suffered its biggest one-day share drop in 18 years, shedding 13% of its value.  Arbuthnot downgraded BP from "Buy" to "Sell" and withdrew its price target, with analyst Douglas Youngson warning that the crisis had "the real smell of death" and stating, "The key question is now 'Can BP survive?'  This situation has a real possibility of breaking the company."  He explained:

> What worries us the most is the emotive language coming from the Obama administration and the reputational damage down so far.  It is difficult to see how the company can recover and it remains unclear what punitive measures will be put in place in terms of its operations in the Gulf of Mexico.  Given the collapse in the share price and the potential for it to fall further we expect that it could become a takeover target – particularly if its operating position in the U.S. becomes untenable.

BP was also downgraded on June 1, 2010 to "Reduce" from "Accumulate" by NCB Stockbrokers analyst Peter Hutton.

116.    The financial press pounced.  Giles Watts, head of equities at City Index, was quoted by the *Express* as saying, "The BP oil spill has not just been an ecological disaster, but it has the potential to be a shareholder disaster, too."  An article entitled "Buying BP" and available via *Seeking Alpha* speculated that the more likely outcome for BP was takeover, given that BP could be easily broken up, and that "this kind of disappearance into the footnotes of oil history is now the base-case scenario."  Another article speculated that BP might face $20 billion in combined costs although "nobody

knows" the precise amount and advised against buying BP stock because "The world

hates them too much and there is too much uncertainty."

117.    In a June 1, 2010 interview with Financial Sense Newshour, energy

investor Matthew Simmons estimated the actual flow rate at 120,000 barrels a day,

saying about the spill, "It may be the worst ecological catastrophe the world has ever

had."  Simmons also speculated that fishing and related industries off the U.S. and

Mexican coasts are destroyed for generations, opening up BP to huge lawsuit exposure

that might prevent a mega-merger.  Also on June 1, 2010, UBS raised its estimates as to

the total spill costs from $12 billion up to a revised figure of $40 billion.

118.    On June 2, 2010, Credit Suisse Group AG estimated that BP's combined

cleanup, restoration, and litigation costs stemming from the Deepwater Horizon disaster

might top $37 billion, while research firm Tudor Pickering Holt estimated the total at $35

billion to $40 billion.  A *Smart Money* article quoted Macquarie Research analyst Jason

Gammel as saying "There's no reason to be moving into [BP] stock today" given the lack

of firm figures related to BP's cleanup liability.

119.    As reported by the Associated Press, on June 8, 2010, BP shares were

down $81 billion (or 43% of their value).  Oppenheimer analyst Fadel Gheir said "it may

be years after [Obama] leaves office before the final settlement" in the Deepwater

Horizon disaster.

120.    In a June 8, 2010 interview with Bloomberg News, Argus Research

analyst Philip Weiss said he would not advise buying BP stock because there were "just

too many unknowns" and buying it would be "just speculating."  Likewise, Chris Bowie,

the head of credit portfolio management at Ignis who eliminated his group's entire credit

exposure to BP the prior week due to such uncertainties, said, "The outcome is so difficult to even take a guess at.  There is no transparency at all.  There is also political meddling associated with BP.  From our perspective, there is no need to take the risk."

121.    On June 9, 2010, energy investor Matthew Simmons, in an interview with *Fortune Magazine* said, "There's a lake at the bottom of the Gulf of Mexico that's over 100 miles wide and at least 400 to 500 feet deep of black oil" and that a hurricane could cause that lake to "paint the Gulf Coast black."  As such, Simmons said of BP:

> They have about a month before they declare Chapter 11.  They're going to run out of cash from lawsuits, cleanup and other expenses.  One really smart thing that Obama did was about three weeks ago he forced BP CEO Tony Hayward to put in writing that BP would pay for every dollar of the cleanup.  But there isn't enough money in the world to clean up the Gulf of Mexico.  Once BP realizes the extent of this my guess is that they'll panic and go into Chapter 11.

122.    A June 9, 2010 Bloomberg News article quoted Guy Lebas, chief fixed-income strategist at Janney Montgomery Scott, as saying that the six-fold increase in estimated spill rate – up to 30,000 barrels daily – was "[t]he piece of news that seems to have broken the camel's back."  CNBC reported that Paul Smith, chief risk officer at Mobius Risk Group, predicted BP would survive but would remain impaired years down the road and said, "Our perspective is that the unknowns with respect to the liabilities are too great right now.  The equity market is saying, 'we don't want to own the stock right now.'  The credit default swaps are saying 'the bonds are more risky.'"  Ockham Research wrote, "[W]e continue to believe that the short term risks are too great for investment (as opposed to speculation). … BP selling in the $20's is sure to pique the interest of opportunistic investors, but for us to recommend the stock we need more clarity into when they can actually stop the leak."  A Moneynews.com article, citing a

*New York Times* report, said that BP faced not only the threat of $37 billion in estimated costs but also the potential for a jury verdict in the hundreds of billions of dollars "and that could send BP under."  It quoted Robert Bryce, senior fellow at the Manhattan Institute, as saying "Even with a prepackaged bankruptcy, BP's brand is permanently tainted" and  "BP will spend the coming decades circling the drain, mired in endless litigation, its reputation irreparably damages, and its finances weakened."

123.    On June 10, 2010, Citi Investment Research analyst Mark Fletcher, whose firm cut its BP stock price targets, wrote "There is no question that BP needs to do the right thing in the U.S. and protect whatever franchise is left."  Argus Research analyst Phil Weiss said that if the U.S. government restricted BP's ability to do business in the U.S., it would hurt BP's ability to remain a standalone company.

124.    On June 11, 2010, Simmons & Co., an investment bank focused on the oil and gas industry, estimated BP's total liabilities at $42 billion, with a worst-case scenario of $91 billion.  A *Financial Advisor Magazine* article said that Wells Fargo Advisors had advised conservative investors to consider less volatile energy stocks instead of BP and quoted financial advisor Keith Amburgey, who began selling BP stock in early May, as saying that "After the spill, [BP's] stock became a short-term speculative play."

125.    On June 12, 2010, the *Wall Street Journal* quoted Andrew Lees, a portfolio manager at Invesco Advisors, as saying that BP's stock "could be dead money for a while."

126.    On June 13, 2010, Bloomberg News reported that Nansen Saleri, CEO of Quantum Reservoir Impact, described by the *Guardian* as one of the world's top experts on oil-well management, as saying that the worst-case scenario for capping the

Deepwater Horizon well was Christmas 2010.  As quoted by Bloomberg the same day,

Chris Rich, head options strategist at Jones Trading Institutional Services LLC said,

"People are still concerned that BP could go bankrupt.  The puts are saying that people

have such a high level of fear.  There's just a huge amount of put buying right now."

127.   On June 14, 2010, John Kilduff, vice president of MF Global, was quoted

by News Busters as saying that "BP's track record supports amply a debarment action"

by the U.S. government that "would mean the loss of a $2.1 billion annual Pentagon

contract" and "would force [BP] to divest itself of its American assets at below-fire sale

prices" in the Gulf of Mexico and Prudhoe Bay.  Mr. Kilduff also speculated that the

prices for a BP-led project could be low because "Who's going to want to step up now

and take over a BP-run operation?  You don't know what kind of rat's nest you're getting

into."

128.   Also on June 14, 2010, as reported in *the New York Times*, Oppenheimer

analyst Fedel Gheit, whose firm had estimated that BP would eventually face $20 billion

in claims and cleanup costs with another $20 billion in potential punitive damages to

federal and state governments, said that he believed the maximum cost to BP would be as

high as $60 billion.  He also said that if BP agreed to pay the salaries of up to 20,000

workers put out of work due to the drilling moratorium, its liabilities could rise by $1

billion to $1.5 billion and it could face an "avalanche" of indirect claims stemming from

the moratorium.  Daniel Pickering, head of research at energy investment bank Tudor

Pickering Holt & Co. LLC, analyzed scenarios where U.S. government overreaching

might cause a BP "death spiral" or prompt BP to sever its North American assets.

129.   On June 14, 2010, *Investment Week*, citing an analysis by the Daily

Telegraph of data compiled by Citywatch, reported that major UK institutions, including Scottish Widows (BP's ninth-largest shareholder), Threadneedle, and AXA, all cut their BP holdings since the Deepwater Horizon disaster began.

130.     Stephen Pope, chief stock strategist at Cantor Fitzgerald, advised investors to sell BP, noting that BP's deepwater drilling aspirations in Brazilian waters could be affected by the Deepwater Horizon spill, that BP is likely to become a "smaller player" than it is today, and that "only [after the well is capped] will we be able to start putting a figure on the cleanup costs."  Calling BP a "dangerous tiger to grab by the tail," Mr. Pope said that estimates of BP's total liability being $40 billion are early calls and "early calls tend to be wrong and the worry is they can be wrong on the low side."

131.     On June 15, 2010, David Pursell, managing director at Tudor Pickering Holt & Co. LLC, noted that the U.S. may revoke BP's status as operator of producing wells in the Gulf of Mexico or Prudhoe Bay and that Congress was already considering ways to bar BP from contracts with the Department of Defense and the E.P.A.  Mr. Pursell explained, "We think there's a good chance the government not only doesn't allow BP to operate going forward, but could rescind operating control."  Also, Jason Chen, partner and head of research at hedge fund Sancus Capital Management said, "There's still so much uncertainty as to what ultimately the liability is and what the government is going to do."

132.     Also on June 15, 2010, Reuters reported that Bank of America – Merrill Lynch ordered its traders not to enter into oil trades with BP that extend beyond June 2011.  The same day, energy investor Matthew Simmons again predicted Chapter 11 for BP via a Barons blog, concluding that BP was essentially insolvent after establishing the

$20 billion fund and that BP's stock is "going to zero."  Fox Business reported that

Deutsche Bank analyst Paul Sankey wrote that fund managers were trimming their BP

holdings, while a *Wall Street Journal* article quoted Keith Springer, president of Capital

Financial Advisory Services, as putting the likelihood of a BP bankruptcy at around 30%.

 As reported by DPA, analysts agreed that the final financial costs to BP are impossible

to calculate at this point and that the "reputational damage" to BP is growing daily.

133.    On June 16, 2010, Yahoo Finance reported that Simmons & Co. estimated

investors were pricing about $64 billion of spill liabilities.

134.    On June 17, 2010, BP suffered a series of downgrades a day after its top

executives met face-to-face with President Obama.  That day, BP was downgraded to

"Hold" from "Buy" by Seymour Price equity analyst Alan Sinclair; to "Underweight"

from "Equalweight" by Barclays Capital equity analyst Lucy Haskins; and to "Neutral"

from "Buy" by Bank of America – Merrill Lynch, which believed that the $20 billion

escrow fund was set to "materially erode" BP's competitive advantage.  Bank of America

– Merrill Lynch Global Research analyst Alejandro Demichellis wrote, "We had

anticipated that the Obama-BP meeting would bring greater clarity on the ultimate Gulf

of Mexico spill liability.  However, the meeting outcome provides little comfort or

clarity."  Bloomberg News reported that Thornburg Securities Corp.'s International

Value Fund and Neuberger Berman LLC's International Fund sold all their BP stock

holdings after the Deepwater Horizon rig explosion.

135.    On June 18, 2010, David Wilton, a Partner at restructuring firm BTG

Mesirow, predicted that BP's liabilities could reach £63 billion (roughly $93 billion) and

Russian President Dmitry Medvedev speculated to the *Wall Street Journal* about BP's

ability to absorb its growing spill-related costs: "Whether [BP] can digest those expenditures, whether they will lead to the annihilation of the company or its breakup into pieces is a matter of expediency."  The Associated Press also reported a Goldman Sachs estimate that each barrel of oil spilled could cost as much as $40,000 in cleanup and compensation costs, causing BP's total liabilities to exceed $100 billion.

136.    In a report dated June 21, 2010, Crowell, Weedon & Co. advised investors to "Continue to avoid BP" and stated:

> British Petroleum does not have the marks of a "buy on weakness"
> turnaround: Within days of the Macondo disaster, we recommended sale,
> exposure reduction, and/or avoidance of BP shares as the shares still
> traded in the $50 area and within just 20% of 52-week highs.  Since early
> May, BP shares have traded to below $30, are currently in the low $30's,
> the dividend is not being paid, and a $20B fund has been established.
> With political winds at gale force levels, we believe there is risk that BP is
> led down a government-directed path of dilution, control and profit
> limits…. No "light at the end of the tunnel":  BP's Gulf of Mexico
> situation lacks the traditional character of even the most difficult corporate
> turnarounds in which we have invested…. Furthermore, unlike the 1989
> Exxon Valdez accident, the Gulf of Mexico disaster is not limited by
> tanker capacity.  We believe that the collective size, timing, lack of
> control, extreme environmental conditions, and propensity of politics
> represent immeasurable risks.

137.    On June 25, 2010, CNN Money reported that BP's stock set a new low at $26.96 per share, prompting Tom Orr, head of research for Weedon & Company to say:

> BP's now in the crosshairs of every regulator and politician known to
> man.  The stock could go into the teens for all we know. … BP's market
> cap is eroding and its ability to finance itself in the capital markets is
> impaired.  It's anybody's guess what can happen, but the fear of the
> market is that the liability could be so enormous that BP may have to seek
> bankruptcy protection.

The same article quoted MacQuarie Research analyst Jason Gammel as saying, "The issue here is that it's a stock that has an unquantifiable liability.  It's hard to forecast."

Also on June 25, 2010, the Toledo Blade quoted Bruce Bullock, director of the

Maguire Energy Institute at Southern Methodist University, as saying that the oil spills' "significant" costs "potentially…are an existential threat to BP."

138.    On June 26, 2010, Bloomberg reported that British Prime Minister David Cameron warned against the "destruction" of BP after its shares fell to a 14-year low. The next day, a Bloomberg News columnist reported that Peter Kaufman, president and head of restructuring and distressed mergers and acquisitions at the Gordian Group, an investment bank, said with regards to BP, "Bankruptcy absolutely is an option…."

139.    On June 28, 2010, Bloomberg reported that UniCredit analysts said that BP should demerge its U.S. operations from those in the rest of the world, among other reasons to define the worst-case scenario of asset seizures and ring fence liabilities and vulnerable assets.

140.    Due to all the foregoing facts and circumstances, BP stock became an imprudent investment for Plan retirement savings when the Deepwater Horizon well exploded on April 20, 2010, unleashing an uncontrollable, unquantifiable, and unabated torrent of oil into the Gulf of Mexico, and it remains an imprudent investment today.  As set forth above, Defendants were responsible for the prudent management of Plan investments, including the Fund.  A prudent fiduciary in like circumstances would have evaluated the foregoing and acted accordingly to protect the Plan from large losses. Defendants failed to do so and are liable for that failure as set forth below.

## CAUSES OF ACTION

A.    **Count I: Failure to Prudently and Loyally Manage the Plan and Assets of the Plan**

141.    Plaintiffs incorporate by reference the paragraphs above.

142.    This Count alleges fiduciary breach against all Defendants.

143.     As alleged above, during the Class Period, the Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

144.     As alleged above, the scope of the fiduciary duties and responsibilities of the Defendants included managing the assets of the Plan for the sole and exclusive benefit of the Plan's Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA.  The Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options and directing the trustee regarding the same, evaluating the merits of the Plan's investment options on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were at all times invested prudently.

145.     Yet, contrary to their duties and obligations under the Plan's documents and ERISA, the Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plan, but was, instead, an imprudent investment in light of the Company's fundamental weaknesses and the excessive risk associated with an investment in BP stock.

146.     Nonetheless, during the Class Period, these Defendants failed to act to protect the Plan and their participants and, *inter alia*, continued to permit the Plan to offer the Fund as an investment option and continued to permit the Plan to invest those contributions in the Fund and permit the Fund to invest in Company stock.  They did so despite the fact that they knew or should have known that the Fund and Company stock

shares were excessively risky.

147.    Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

148.    Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Fund, but either had no such procedure or failed to follow it.  Moreover, they failed to conduct and act on the results of an appropriate investigation of the merits of continued investment in the Fund.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in the Fund under these circumstances.

149.    Defendants breached their fiduciary duty respecting the Plan's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

150.    Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

151.    According to United States Department of Labor ("DOL") regulations and

case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

152.    According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

(a)    A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

(b)    Consideration of the following factors as they relate to such portion of the portfolio:

(i)    The composition of the portfolio with regard to diversification;

(ii)    The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

(iii)    The projected return of the portfolio relative to the funding objectives of the plan.

153.    Given the Company's dire financial straights as described above, Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Company stock because, among other reasons:

(a)    Defendants knew of and/or failed to investigate the failures of and dangers to the Company as alleged above; and

(b)    The risk and volatility associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with investment in company stock.

154.    Knowing of this extraordinary risk, and given the volatility in the Company's stock Defendants had a duty to avoid permitting the Plan or any Participant from investing the Plan's assets in the Fund or Company stock.

155.    Further, knowing that the Plan was not adequately diversified, but was heavily invested in Company stock, Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

156.    Defendants breached their fiduciary duties by, *inter alia*, failing to engage appropriate independent advisors who could make independent judgments concerning the Plan's investment in the Company; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Company stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to avoid adversely impacting their own compensation or drawing attention to the Company's condition and inappropriate practices; and by otherwise placing their own and the Company's interests above the

interests of the Participants with respect to the Plan's investment in Company stock.

157.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

158.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### B.    Count II: Co-Fiduciary Liability

159.    Plaintiffs incorporate by reference the allegations above.

160.    This Count alleges co-fiduciary liability against all Defendants.

161.    As alleged above, during the Class Period Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

162.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  Defendants breached all three provisions.

163.    Knowledge of a Breach and Failure to Remedy.  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In particular, they did not communicate their knowledge of the Company's improper activity to the other fiduciaries.

164.    In particular, BP knew of the Company's precarious financial condition, it also knew that the Investment Committee, its members and/or State Street were breaching their duties by continuing to invest in Company stock.  Yet, BP failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the Company's precarious financial condition and obfuscating the risk posed to the Plan.

165.    Knowing Participation in a Breach.  ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  As alleged above, each of the Defendants participated in the management of the Plan's improper investment in the Fund and, upon information and belief, knowingly participated in the improper management of that investment by the other Defendants.

166.    Enabling a Breach.  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes

liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C.

§1104(a)(1), in the administration of his specific responsibilities which give rise to his

status as a fiduciary, he has enabled another fiduciary to commit a breach.

167.    As a direct and proximate result of the breaches of fiduciary duties alleged

herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and

beneficiaries, lost millions of dollars of retirement savings.

168.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109,

1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by

their breaches of fiduciary duties alleged in this Count and to provide other equitable

relief as appropriate.

## CAUSATION

169.    The Plan suffered millions of dollars in losses of vested benefits because

substantial assets of the Plan were imprudently invested or allowed to be invested by

Defendants in the Fund during the Class Period in breach of Defendants' fiduciary duties.

170.    Had the Defendants properly discharged their fiduciary and co-fiduciary

duties, including the monitoring and removal of fiduciaries who failed to satisfy their

ERISA-mandated duties of prudence and loyalty, eliminating Company stock as an

investment alternative when it became imprudent, and divesting the Plan of Company

stock when maintaining such an investment became imprudent, the Plan would have

avoided some or all of the losses that they suffered.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

171.    The Defendants breached their fiduciary duties in that they knew or

should have known the facts as alleged above and, therefore, knew or should have known

that the Plan's assets should not have been invested in the Fund during the Class Period.

172.   As a consequence of the Defendants' breaches, the Plan suffered a significant loss of vested benefits.

173.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan….".  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate….".

174.   Plaintiffs and the Class and the Plan are therefore entitled to relief from Defendants in the form of:

(a)   a monetary payment to the Plan to make good to the Plan the loss of vested benefits to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b)   injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

(c)   reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(d)   taxable costs and interest on these amounts, as provided by law; and

(e)   such other legal or equitable relief as may be just and proper,

including certification of a class in the event such is deemed required.

## JURY DEMAND

Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.        A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and participants;

B.        An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.        Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.        An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.        An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company stock;

F.        Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants, including class certification if deemed necessary.

DATED: June 29, 2010

PLAINTIFFS, SYED ARSHADULLAH
AND RON PIERCE


By: /s/ Charles R. Watkins
Charles R.Watkins
**FUTTERMAN HOWARD ASHLEY
 WATKINS & WELTMAN, P.C.**
122 South Michigan Avenue, Suite 1850
Chicago, IL  60603
Telephone: (312) 427-3600
Facsimile: (312) 427-1850


Robert A. Izard
Matthew Tuccillo
Wayne T. Boulton
**IZARD NOBEL LLP**
29 South Main Street, Suite 215
West Hartford, CT 06107
Telephone: (860) 493-6292
Facsimile: (860) 493-6290


Ronen Sarraf
Joseph Gentile
**SARRAF GENTILE LLP**
116 John Street, Suite 2310
New York, NY 10038
Telephone: (212) 868-3610
Facsimile: (212) 918-7967